**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-502 (CKK)** |
| **v.** | : | |
| | : | |
| **DANIEL CHRISTMANN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Daniel Christmann to 30 days' incarceration and $500 in restitution.

### I.     Introduction

Defendant Daniel Christmann, a 40-year-old former plumber, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol were $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Defendant Christmann pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of incarceration is appropriate in this case because (1) Christmann saw and heard warning signs before he entered the Capitol Building (including seeing an area closed sign, video-recording clashes between rioters and police, hearing an alarm coming from the building, and hearing rioters discussing police using chemical irritant inside the building) but still entered; (2) he entered the Capitol Building by climbing through a broken window; (3) he went into sensitive office and conference space, the Senator Spouses' Lounge; (4) in messages to friends and posts on social media, he celebrated the riot as "fun," "cool," and as a *first step* towards rioters' achieving their political objectives; (5) he provided excuses to the FBI (e.g., that he was pushed into the Capitol Building by the force of the crowd) that were contradicted by video evidence; (6) he requested that at least two associates delete videos he previously provided them, after he learned that others at the Capitol on January 6th had been arrested; and (7) more than two years after January 6th, he has continued to express a lack of remorse for his actions in commentary and interviews.

The Court must also consider that Christmann's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts and circumstances of Christmann's crime support a sentence of 30 days' incarceration and $500 in restitution.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 44 (Statement of Offense), at ¶¶1-7.

*Defendant Christmann's Role in the January 6, 2021 Attack on the Capitol*

On or about late January 5, 2021, Christmann, then a resident of Brooklyn, New York, picked up a friend and drove to Washington, D.C. to attend the "Stop the Steal" rally. The following day, on January 6, 2021 ("January 6th"), they arrived in D.C. and attended the rally. According to a subsequent podcast interview of Christmann, he and his friend left the rally early to "beat the traffic" and he received a call from someone explaining that "Dude, everyone is just running into the building right now… *People just took over the Capitol Building*, it's like, it's like open to the public right now." *See* Exhibit 1 at 14:50-16:30 (emphasis added).[2] After learning that rioters had entered the Capitol Building, Christmann decided to head towards the Capitol himself. *Id* at 16:30-16:42.

According to Google location history for a device used by Christmann, Christmann was on Capitol grounds between approximately 2:51 p.m. and 3:39 p.m. As he entered restricted Capitol grounds, Christmann was aware that an "Area Closed" sign was posted to fencing outside the grounds, and saw that this fencing and a metal barrier had been knocked down. Statement of Offense, ECF 44, at ¶ 9. As Christmann moved toward the Upper West Terrace, he saw and video-recorded rioters clashing with a line of officers, who sprayed the crowd with a chemical agent to push the crowd back. ECF 44, at ¶ 9; *see also* Exhibit 2 (video Christmann recorded, obtained from Christmann's Instagram).  Image 1 shows officers spraying the nearby crowd as Christmann video-recorded the clash.

---

[2] Exhibit 1: "Political Prisoner" Podcast Interview, December 11, 2021 episode < https://podcasts.apple.com/us/podcast/the-political-prisoner-podcast-january-6-defendant/id1595317819?i=1000544681988 >.



*Image 1*
(Screenshot from Exhibit 2  at Timecode 0:10)

Christmann also stood with a crowd directly opposite to a line of officers in riot gear on the Upper Northwest Terrace, as various rioters yelled and shouted at the officers, including one rioter who shouted, "We don't want you, we want Nancy.  We want the rest of them…."  Exhibit 3 at 10:59-11:12.[3]  While facing that line of officers with the crowd, Christmann cupped his hand to his mouth and appeared to be shouting at officers as well. *See* Image 2. Another publicly available video shows an even closer view of Christmann yelling at police, however, the sound of what rioters yelled at police is not played in that video. Exhibit 4  at 0:19-0:20.[4]

---

[3] Exhibit 3: Publicly available riot footage including audio of rioters shouting at officers on the Upper Northwest Terrace  < https://archive.org/details/yurTssjnEMRFbhFDG >.
[4] Exhibit 4: Publicly available riot footage including video of rioters shouting at police (no audio of crowd)  < https://archive.org/details/c86cf4FwTGMJCx2TS >. The publicly posted internet videos in Exhibits 4 and 5 did not have the specific times listed on them, and it is unclear if this incident occurred before or after Christmann entered the Capitol Building.

 

*Image 2*
(Screenshot from Exhibit 3 at
Timecode 11:04)

*Image 3*
(Screenshot from Exhibit 4 at
Timecode 0:19)

Publicly available footage on Twitter showed Christmann in the Northwest Courtyard waiting to enter the Capitol Building, as part of a large group of rioters.  *See* Exhibit 5 at 0:15-0:16.[5]  Image 4 shows Christmann video recording while he attempted to enter the budiling. Christmann wore a light-colored, plaid jacket along with a light-colored button-down collared shirt and a darker-colored hood, and is circled in all images below in which he appears.

---

[5] Exhibit 5: Publicly available footage on Twitter showing rioters in the Northwest Courtyard entering and exiting the Capitol Building < https://twitter.com/i/status/1346918926140239872 >.



*Image 4*
(Screenshot from Exhibit 6 at Timecode 0:15)

As Christmann slowly approached the Capitol Building, he could hear alarms blaring. ECF 44, at ¶ 10; *see also* Exhibit 6 (video recorded by Christmann as he waited to enter the Capitol Building, obtained from his "dannyforsenate" Instagram account). During the video Christmann recorded, he also heard a rioter talk about "tear gas" as other rioters were exiting the building, and Christmann immediately turned to film one rioter who shouted "I need water. Somebody's got to have water over here," seemingly to wash off chemical irritant. *See* Exhibit 6 at 0:08-0:17.

At approximately 3:13 p.m., Christmann entered the Capitol Building through a broken window by the Senate Wing door. *See* Exhibit 7 at 0:50-0:59 (closed-circuit television, or "CCTV," footage of rioters entering the Capitol through the Senate Wing door and nearby windows). Image 5 shows Christmann climbing through the broken window.



*Image 5*
(Screenshot from Exhibit 7 at Timecode 0:51)

While inside the Capitol Building, Christmann remained by the Senate Wing door momentarily, then walked toward the Crypt on the first floor, and took a right turn down a hallway.  ECF 44, at ¶ 11; *see also* Exhibit 8 at 24:08.[6] Image 6 shows Christmann walking down that hallway, phone in hand.

---

[6] Exhibit 8: Publicly available footage of inside the Capitol Building recorded by another rioter < https://archive.org/download/aMYgzpJJ7mPvYqY22/TRUMP_RALLY_DC_sHgZco_GR.mpeg 4 >.



*Image 6*
(Screenshot from Exhibit 8 at Timecode 24:08)

Christmann then entered an office and conference area, the "Senate Spouses' Lounge," located off of the hallway connecting the Senate Wing door to the Crypt. ECF 44, at ¶ 11.[7] Christmann watched from a window in the Spouses' Lounge as law enforcement outside attempted to prevent others from entering the Capitol Building. ECF 44, at ¶ 11.  Christmann recorded his entrance into the Spouses' Lounge and the scene outside with the officers that he viewed from the room's window. *See* Exhibit 9 (video by Christmann, obtained from his "dannyforsenate" Instagram account, during which Christmann recorded his entering the Spouses' Lounge, watching scenes outside of the room's window, and exiting the Lounge). Image 7 shows a rioter standing

---

[7] The Senate Spouses' Lounge or Senate Spouses' Lobby, formerly known as the "Senate Wives' Lounge," is a room in the U.S. Capitol that has historically served as a private meeting space for the spouses of Senators to plan events that transcend bipartisan politics.

on a chair in the office, appearing to take a "selfie."  Image 8 shows the officers outside of the

Spouses' Lounge window attempting to prevent others from entering the Capitol Building.




*Image 7*
(Screenshot from Exhibit 9 at
Timecode 0:02)

*Image 8*
(Screenshot from Exhibit 9 at
Timecode 0:14)

Christmann then returned to the Senate Wing door area, where the alarm continued to blare.

ECF 44, at ¶ 11; *see also* Exhibit 8 at 25:00-25:15. While there, Christmann saw officers moving

rioters out of the Capitol Building and blocking other rioters from entering the building through

the same window through which Christmann had entered.  ECF 44, at ¶ 11; *see also* Exhibit 8 at

25:06-25:15.  Image 9 shows Christmann, holding his phone, and walking past officers towards

the Senate Wing door.



*Image 9*
(Screenshot from Exhibit 8 at Timecode 25:06)

At approximately 3:16 p.m., Christmann exited the Capitol Building through a second broken window next to the Senate Wing door. *See* Exhibit 10 at 2:31-2:46 (CCTV footage of rioters exiting the Capitol through the Senate Wing door and nearby windows).  Image 10 shows Christmann crawling through the broken window to exit.  As noted above, according to Google location history for a device used by Christmann, Christmann left Capitol grounds at approximately 3:39 p.m.



*Image 10*
(Screenshot from Exhibit 10 at Timecode 2:43)

*Christmann's Post-January 6 Statements and Conduct*

A. *Social Media and Obstructionist Conduct Shortly After Christmann's Participation in the January 6th Riot*

After the attack on the Capitol, Christmann sent messages over and made posts to platforms including Instagram and Facebook, in which he expressed no remorse, celebrating the riot and lamenting that it did not last longer or go further. For instance, Christmann sent an audio message to another individual over Instagram late January 6, 2021, during which Christmann said, "Yeah, uh, finally we had a mutiny, and then that looks like it's only gonna last for like half an hour." Exhibit 11.

The following day, on January 7, 2021, Christmann sent an audio message over Instagram, to another Instagram user, during which he said, "…[I]t's so obvious that that election was stolen,

and when people are gonna storm the Capitol building, and I see people storming the Capitol building, that shit's fun and I'm gonna do it too." Exhibit 12 at 0:34-0:54. That same day, Christmann sent an audio message to another Instagram user, during which he said, "Let's not condemn the MAGA people that charged the Capitol building because they felt like their voices aren't being heard. Let's stay on task and condemn these piece of shit cops that threw people off buildings… shooting unarmed women in the neck. They are pieces of shit…" Exhibit 13 at 0:24-0:49.  On January 9, 2021, Christmann posted a video to Instagram, during which he said, "Forget this, forget this storming the Capitol that happened the other day, it was just a fun day, who cares. I mean, the cops killed another innocent person, what a surprise. But it's just a fun day. Where are they going with all this?" Exhibit 14 at  0:41-1:00. Additionally, on January 14, 2021, a video was posted on Christmann's "dannyforsenate" Instagram account of Christmann being interviewed by an Asian news network. Exhibit 15. During that interview, Christmann excitedly explained, "That was the coolest thing that's ever happened in this century. The American people stormed the most corrupt, genocidal Capitol building in the history of the world."  Exhibit 15 at 0:08-0:20. On January 16, 2021, Christmann also uploaded another video of that interview to his Facebook page. Exhibit 16.

A few days later, on January 18, 2021, Christmann sent the following private messages using his Facebook account "Daniel.christmann.14" to direct two individuals to "remove" and "delete" "those videos," after two other individuals he knew (his "friend jake" and the manager of his unsuccessful 2020 New York state senate campaign) had been recently arrested pertaining to the January 6th riot.  In doing so, Christmann explicitly referenced that the two people he knew "got taken in," presumably upon arrest for their conduct on January 6th.

**Thread** (2347748571984274)
**Current** 2021-05-10 17:06:32 UTC
**Participants** ▮▮▮▮▮▮▮▮▮▮▮▮
Daniel Christmann (Facebook: 1620259723)
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Author** Daniel Christmann (Facebook: 1620259723)
**Sent** 2021-01-18 23:48:28 UTC
**Body** Please remove those videos

**Author** Daniel Christmann (Facebook: 1620259723)
**Sent** 2021-01-18 23:49:33 UTC
**Body** Its actually the only place I sent them. So delete them. My friend
Jake got taken in and my campaign manager from this summer got
taken in.
Its go time on the end of times.

**Author** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent** 2021-01-18 23:50:37 UTC
**Body** Deleted

**Author** Daniel Christmann (Facebook: 1620259723)
**Sent** 2021-01-18 23:50:44 UTC
**Body** Thanks

*B.  Christmann's Post-Arrest Interview with the FBI*

On July 28, 2021, Christmann gave a voluntary post-arrest interview to the FBI. During

that interview, Christmann admitted to being at the Capitol on January 6th.  When asked why he

went into the Capitol Building, Christmann initially insisted that he was just being carried by the

flow of the crowd ("'Cause at a certain point, there were so many people, you just start getting

pushed, you can't turn yourself around, you can't").  After agents pointed out that Christmann was

on camera crawling through a window to enter the Capitol building, instead of being involuntarily

pushed by the crowd into the building, then Christmann adjusted his response and insisted that he

had entered the building because there were 100 people telling him to hurry up.[8]  A few minutes

---

[8] As noted above, video of Christmann at the Capitol showed him waiting to enter the Capitol
building as he stood outside filming other rioters and goings on.  Accordingly, video evidence
confirms that Christmann's initial statements to the FBI were false.

later, Christmann tried out a third excuse, and indicated that his actions (presumably including entering the Capitol Building) were because he was looking for the woman with whom he had traveled to D.C. Throughout the interview, Christmann downplayed his actions and questioned why he was even there ("You guys are both trying to take my freedom away, for not even committing a crime").

### C.  Post-Arrest and Post-Plea Statements to the Public

On November 28, 2022, Christmann pleaded guilty to Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). However, Christmann continued to discuss January 6th several months after the event in at least two podcast interviews, and he has continued to provide various excuses for his conduct and to insist that rioters did nothing wrong on January 6th.  For instance, more than 11 months after January 6th, during the December 11, 2021 episode of the "Political Prisoner" podcast (Exhibit 1), Christmann reiterated one of the various excuses he provided during his FBI interview (that he only entered the Capitol Building to look for his friend) and he added a new excuse, that he attended the Stop and Steal rally and went to the Capitol as a journalist.  Exhibit 1 at e.g., 9:40-9:49 and 29:43-30:06 (Christmann asserts that he attended the Stop the Steal rally and went to the Capitol as a journalist) and 17:39-17:48 and 18:40-18:49 (Christmann asserts that he went into the Capitol Building to find his friend).

Additionally, Christmann was a guest on an April 2023 epsiode of another podcast, *History Homos*. During that podcast—more than two years after January 6—Christmann continued to insist that he and other rioters did nothing wrong. Christmann commented, "…[T]he people knew they could overpower the Senate, and they knew that they could go into that building and make

their demands, and law enforcement couldn't do anything, 'cause legally they had to stand by."

Exhibit 17 at 11:38-11:54.[9]

*The Charges and Plea Agreement*

On July 16, 2021, the United States charged Christmann by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On July 28, 2021, law enforcement officers arrested him at his home in New York. On August 2, 2021, the United States charged Christmann by a four-count Information with violating the same four charges listed in the criminal complaint. On November 28, 2022, pursuant to a plea agreement, Christmann pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

**III.    Statutory Penalties**

Christmann now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. § 1B1.9.

---

[9] Exhibit 17: *History Homos*, Ep. 151 - The New York City Draft Riots ft. Dan Christmann (April 23, 2023) < https://player.fm/series/history-homos/ep-151-the-new-york-city-draft-riots-ft-dan-christmann >.

IV.     **Sentencing Factors Under 18 U.S.C. § 3553(a)**

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 30 days' incarceration.

A.  **The Nature and Circumstances of the Offense**

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Christmann's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Christmann, the absence of violent or destructive acts is not a mitigating factor. Had Christmann engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors here is that – more than two years after January 6th – Christmann continues to deny any wrongdoing in very public forums. Christmann engaged in behavior at the Capitol that would have been problematic even outside the context of a civil disorder aimed at stopping the peaceful transfer of presidential power – he entered the Capitol Building without completing a security and screening process, he climbed into the building through a broken window, and he left the building's hallways and entered a room reserved for the family of Senators, not the public. Adding in the context and the weight of the event that was taking place that day, the certification of the 2020 Presidential election, and Christmann's actions (in conjunction with that of other rioters) caused more harm than any mere trespass. Despite this,

as noted above, Christmann has maintained in podcast interviews and commentary that he and other rioters did nothing wrong. He has displayed a lack of remorse that suggests he does not understand the gravity of the events on January 6th.

Another important factor here is that Christmann entered a sensitive office and conference space, the Senate Spouses' Lounge. A defendant's entry into a sensitive space places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. Additionally, as noted above, in his December 2021 podcast interview, Christmann admitted that he decided to go to the Capitol *after* learning about rioters taking over the building, indicating that he wanted to be part of the chaos, not a peaceful protest. Christmann also saw chaos and violence (e.g., hearing alarms, finding out that police were using chemical irritants to stop rioters) before entering the building and still entered. Furthermore, Christmann requested that asscoiates delete evidence of January 6th that he had previously sent to them, which is behavior that can seriously impede and undercut investigations and should be discouraged with appropriate punishment.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 30 days' incarceration in this matter.

### B. The History and Characteristics of Christmann

As set forth in the PSR, Christmann's criminal history consists of a 2010 New Jersey state conviction for Criminal Attempt (Possession of Marijuana), for which he received a sentence of 6 months in a diversion program (PSR ¶ 29), and Christmann now has a medical marijuana card PSR ¶ 45. Despite his lack of criminal history, Christmann continues to deny wrongdoing as recently as in the April 2023 podcast discussed above, indicating that has learned no lessons and has not been deterred from such behavior in the future.

Defendant Christmann has indicated that he is now pursuing a degree in Journalism from Saint Joseph's University. PSR ¶ 48. He is otherwise unemployed and receiving workman's compensation. PSR ¶ 52.[10] However, as noted above, Christmann was able to successfully climb into and out of broken windows at the Capitol and to walk around Capitol grounds, and so he does not appear to have physical ailments that would prohibit a sentence of jail time.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan);  *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[10] The Final PSR notes that the defendant failed to submit requested financial information and forms (including a Monthly Cash Flow Statement, Net Worth Statement, and Financial Release of Information) to Probation (PSR ¶ 59).  Additionally, the defendant did not provide a response to Probation's request for objections to the PSR.  (PSR p. 16)

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Christmann has displayed a consistent and ongoing failure to acknowledge his wrongdoing and role in January 6th, mostly recently in an April 2023 podcast, as discussed above.  This behavior suggests a sentence is needed that is serious enough to communicate to the defendant the gravity of the events of January 6th and a need to reflect on his decisions that day and afterwards. Christmann's conduct evinces not just one but a *series* of bad decisions, including going to the Capitol *after* finding out that the building had been taken over; entering the Capitol building through a broken window, despite alarms and warning signs that entrance was not permitted; and asking associates to delete videos related to January 6th after learning that two friends were arrested for their roles in the riot.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[11] This Court must sentence Christmann based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Christmann has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C.

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

§ 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted.  *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than

codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the

sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr.  at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant also pled guilty to 40 U.S.C. § 5104(e)(2)(G). Similar to the instant case, Mazzocco entered through the Senate Wing door around the same time that Christmann entered the building (Mazzocco at 3:10 p.m., whule Christmann entered at 3:13 p.m.); he took photos while at the Capitol; he remained inside the Capitol for a brief period of time; he entered the Spouses' Lounge, a sensitive space; he had some social media activity regarding January 6th indicating that he supported riot (and the disruption of the Congressional proceedings); (5) he was not genuinely remorseful of his conduct (Mazzocco's expressions of contrition were belied by text messages sent to family and friends shortly after the event); and (6) he had minimal criminal history (in Mazzocco's case none). However, unlike Christmann, Mazzocco observed (and took a selfie during) the breach of a door on the east side of the Capitol before walking to the West side of the Capitol and entering the building through the Senate Wing door. Mazzoco also stayed slightly longer in the Capitol Building (12 minutes instead of Christmann's three minutes) and went to an additonal location inside the building, specifically the Crypt. Judge Chutkan sentenced Mazzocco to 45 days of incarceration.  In light of  Mazzoco entering at the Senate Wing door after observing violence and chaos on the East Front and his additonal activity inside of the building, a slightly more modest jail request of 30 days' is appropriate in the instant case.

In *United States v. Oliver Sarko,* 21-CR-591 (CKK), the defendant also pled guilty to 40 U.S.C. § 5104(e)(2)(G). Similar to the instant case, Sarko observed violence and broken windows before entering the Capitol Building; he entered the Spouses' Lounge, a sensitive space, while in the building; he video-recorded while inside of the Capitol Building; and he posted video to social

media of his time at the riot.  Distinct from the instant case, Sarko also entered Senator Merkley's office, a highly sensitive space, and had slightly more criminal history; however, Sarko expressed remorse for his conduct on January 6 after the fact and had not posted comments about January 6th since that date. Additionally, Sarko did not ask others to delete evidence. This Court gave Sarko 30 days' incarceration. In light of the similar degree of seriousness between the two cases, the same sentence would be appropriate here.

The government also acknowledges that *United States v. Rutledge* et al., 21-cr-643 (CKK) is somewhat similar to the instant case.  In *Rutledge*, the three co-defendants (Karegan Bostic, Willard Bostic, Jr., and Meghan Rutledge) also pled guilty to violating 40 U.S.C. § 5104(e)(2)(G); they entered the Capitol Building through the Senate Wing door at around the same time as Christmann (those co-defendants entered at 3:12 p.m., about one minute before Christmann); they took photos while inside the building; they stayed in the Capitol Building for a similar amount of time to Christmann (those codefendants stayed in the building for about four minutes, while Christmann stayed for about three); they similarly claimed to have entered the building to find a friend (Rutldge claimed that she entered the building to find the fourth person in her group); they similar expressed no remorse and downplayed the riot on social media (e.g., Rutlege took to Instagram to blame the riot on Antifa); and they had similar limited criminal history (e.g., Rutledge had only a 2016 marijuana conviction). The Court gave the defendants sentences of probation with home detention (three month's home detention for for Rutlege and Willard Bostic and one month's home detention for Karegan Bostic). However, in that case, those co-defendants did not enter a sensitive space, such as the Spouses' Lounge, while inside of the Capitol Building.  They also did not enter the Capitol Building through a broken window. Additionally, they did not destroy or ask anyone to destroy evidence. Accordingly, the lower recommendation and sentence in that case

would not be appropriate here, and a modest jail-time sentence (of 30 days) would better suit Christmann's more serious conduct in the instant case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.      Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[12] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify

---

[12] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Christmann must pay $500 in restitution, which reflects in part the role he played in the riot on January 6.[13] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had "caused, as of April 5, 2022, approximately $2,734,783.14 damage to the United States Capitol." *Id.* (The damages figure in the plea agreement was based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of April 5, 2022. As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Christmann's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 11.

## VI.     Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 30 days' jail time and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters

---

[13] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  /s/ Sonia Mittal

SONIA MITTAL
Assistant United States Attorney
United States Attorney's Office for
the District of Columbia
Illinois Bar No. 6314706
sonia.mittal@usdoj.gov
(202) 821-9470

By:  /s/ Shanai Watson

SHANAI WATSON
Trial Attorney, Department of
Justice
1301 New York Ave. N.W.,
Washington, DC 20005
New York Bar Reg. No. 5003165
shanai.watson@usdoj.gov
(202) 616-0245